**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ken Gazian, et al., | No. CV-13-01312-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Wells Fargo Bank NA, et al., | |
| Defendants. | |

Following a pretrial conference on December 3, 2014, the Court directed the parties to brief four issues: (1) choice of law; (2) fraud "expectancy damages" available in this case, if any; (3) whether Wells Fargo can fairly claim surprise about an alternative causation theory asserted in the proposed final pretrial order; and (4) whether Gazian's testimony on the alternative causation theory (that he could have done the deal through other financing) is sufficient to survive summary judgment. Doc. 191. The parties have completed the briefing. Docs. 197, 199, 203, 204. For reasons set forth below, the Court chooses Texas law and grants summary judgment in favor of Wells Fargo on Plaintiffs' claim for lost profits arising from the Park Plaza Tower Transaction. The Court also addresses two remaining motions and sets a second final pretrial conference.

**I.     Background.**

Plaintiffs in this case are Ken Gazian, Pierre Investments, Inc., and Aragadz Foods, Inc., d/b/a Devanche Jewelers. Gazian is a Texas resident and both Pierre and

1 Devanche are Texas corporations wholly owned by Gazian.  Plaintiffs originally brought this action against both Wells Fargo and the Kelly Defendants based on an allegedly fraudulent scheme perpetrated by the Kelly Defendants.  Plaintiffs allege that they transferred $80,000 to the Kelly Defendants' Wells Fargo account for the "purchase of securities allegedly posted on the London Stock Exchange."  Doc. 101, ¶ 10.  The securities transaction was represented "as having a total value in excess of $45,000,000," and Plaintiffs were to receive "a return of $280,000."  *Id.*

Plaintiffs allege that they "sought assurance from Wells Fargo" that the Kelly Defendants were legitimate business people and were in the process of putting together a large securities transaction.  *Id.*  Wells Fargo employees from a branch in Mesa, Arizona allegedly represented to Plaintiffs "on multiple occasions that there was a transaction being put together for the purchase of the securities, that funds were present for the purchase of securities, and that Wells Fargo had undertaken numerous successful transactions" with the Kelly Defendants.  *Id.*, ¶ 11.  Plaintiffs entered into an "Irrevocable Commitment" with the Kelly Defendants and Wells Fargo that set forth the terms discussed above.  *Id.*, ¶ 12.

Plaintiffs assert that they were convinced by the Kelly Defendants in October 2011 to reinvest $250,000 of the $280,000 promised by the Irrevocable Commitment to "fund a $5,000,000 loan to purchase and renovate the Park Plaza Tower," an office building in Dallas.  *Id.*, ¶ 16.  Plaintiffs also agreed to pay an additional $50,000 to fund the transaction.  *Id.*  Plaintiffs assert that on November 29, 2011, when they attempted to withdraw $30,000 and transfer $250,000 to the Kelly Defendants, they "were informed by Wells Fargo that the accounts had been emptied and that Wells Fargo would not transfer any amount to Plaintiffs pursuant to the Irrevocable Commitment."  *Id.*, ¶ 21.

Plaintiffs reached a settlement with the Kelly Defendants in late 2013.  The Court dismissed the Kelly Defendants on November 26, 2013.  Doc. 58.  Thus, the only claims that remain in this case are those brought against Wells Fargo.

/ / /

## II. Choice of Law.

Plaintiffs contend that Texas law governs this case. Wells Fargo claims that Arizona law controls. Both parties agree that there are relevant conflicts between Texas and Arizona law, and that the Court must apply Texas choice-of-law principles because this case was transferred from Texas. Docs. 197 at 1-2; 199 at 2 n.1; *see also Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1045 (9th Cir. 2012).

### A. Fraud and Misrepresentation.

Texas has adopted the Restatement approach to choice-of-law questions, asking which state has the most significant relationship to the issue to be resolved. *Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 355 (Tex. Ct. App. 2003). For claims of fraud and misrepresentation that involve more than one state, Texas courts look to § 148(2) of the Restatement (Second) of Conflict of Laws. *Id.* For claims asserting negligence, Texas courts look to § 145. *Shein v. Stromboe*, 102 S.W.3d 675, 696 (Tex. 2002).[1]

Section 148(2) identifies the following factors for identifying the state with the most significant relationship to a multi-state fraud or misrepresentation: (a) the place or places where the plaintiff acted in reliance on the defendant's representations; (b) the place where the plaintiff received the representations; (c) the place where the defendant made the representations; (d) the domicile, residence, nationality, place of incorporation and place of business of the parties; (e) the place where a tangible thing, which is the subject of the transaction between the parties, was situated at the time; and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant. Restatement § 148(2).

///

---

[1] Plaintiffs' Second Amended Complaint asserts claims for fraud, negligent misrepresentation, and negligence. Doc. 101. It also contains statutory fraud and securities fraud claims, but the parties' final pretrial order states that Plaintiffs are no longer pursuing these claims. Doc. 144 at 3. The Second Amended Complaint also includes claims for unjust enrichment, disgorgement, and conspiracy, but the parties do not mention these claims in their choice-of-law arguments or in their proposed final pretrial order. Accordingly, the Court will confine its analysis to the claims of fraud, negligent misrepresentation, and negligence.

After review, it is clear that factors (b), (d), and (e) weigh in favor of Texas. Plaintiffs were located in Texas when they received the alleged misrepresentations made by Wells Fargo. Plaintiffs' domicile and place of business are in Texas, while Wells Fargo is domiciled in South Dakota. *See* Doc. 1 at 3-4. And the "tangible thing" that was part of the subject of Plaintiffs' effort to obtain loan financing – the Park Plaza Tower – is located in Dallas, Texas.[2]

Factor (a), the place or places where Plaintiff acted in reliance on Defendant's misrepresentations, involves both states but leans most heavily towards Texas. Plaintiffs were located in Texas when they decided to rely on the alleged misrepresentations of Wells Fargo. They withdrew funds from their Texas bank accounts and took steps in Texas to wire the funds to Wells Fargo's office in Arizona. Although a portion of their actions in reliance on the misrepresentation occurred in Arizona (deposit of the funds), most of the actions occurred in Texas.

The same is true of factor (f), the place where Plaintiffs were to render performance under the Irrevocable Commitment. Plaintiffs were to withdraw funds from their Texas accounts and transfer the funds to Arizona, where they would be deposited at Wells Fargo. As with factor (a), more of these contacts occurred in Texas than Arizona.

Only factor (c), the place where the defendant made the representations, favors Arizona. The representations are alleged to have been made by Wells Fargo employees located in Arizona.

Many of Wells Fargo's arguments in favor of Arizona law focus on the conduct of the Kelly Defendants. But as Wells Fargo itself acknowledges, "the focus must be on *Wells Fargo's* relationship with plaintiffs only, regardless of what other tortfeasors or former defendants may or may not have done." Doc. 199 at 3 (emphasis in original).

Wells Fargo also focuses its attention on the Irrevocable Commitment, but this is not a breach of contract case and, as noted above, Plaintiffs' performance under that

---

[2] The transactions between Plaintiffs and the Kelly Defendants also concerned securities located in Europe. This subject of the transaction does not favor either Arizona or Texas.

- 4 -

agreement was to occur primarily from Texas for the purpose of financing the acquisition of securities in Europe.

The fact that Plaintiffs are domiciled in Texas also carries significant weight. As comment i to § 148(2) explains:

> The plaintiff's domicile or residence, if he is a natural person . . . are contacts of substantial significance when the loss is pecuniary in its nature, as is true of the situations covered by the rule of this Section. This is so because a financial loss will usually be a greatest concern to the state with which the person suffering the loss has the closest relationship. . . . The domicile, residence, and place of business of the plaintiff are more important than are similar contacts on part of the defendant.

§ 148(2), cmt. i. This factor particularly carries weight when the domicile of the defendant, as here, is not in the state whose law the defendant urges the court to choose.

Considering all the factors, the Court concludes that Texas has the most significant relationship with the fraud and misrepresentations at issue in this case. This is particularly true in light of the fact that only two contacts point toward Arizona. All other meaningful contacts occurred in Texas.

**B.     Negligence.**

The Court also concludes that Texas law governs the negligence claim. Section 145(2) of the Restatement includes the following factors for identifying the state with the most significant relationship to a negligence claim:  (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. Restatement § 145; *see also Schein*, 102 S.W.3d at 696.

Factors (a) and (c) clearly favor Texas law. Plaintiffs were injured and are domiciled in Texas; Wells Fargo is domiciled in South Dakota.

Factor (b), the place where the tortious conduct occurred, favors Arizona, although the parties do not address whether some of Wells Fargo's negligence occurred elsewhere.

Factor (d), the place where the relationship was centered, is mixed. Plaintiffs' acted from Texas, Wells Fargo from Arizona, for money transfers touching both states and transactions affecting securities in Europe and an office building in Texas.

Considered together, the Court concludes that the § 145(2) factors favor a choice of Texas law. Two of the factors clearly point toward Texas, a third is mixed, and a fourth points toward Arizona. The Court's conclusion is buttressed by the fact that Texas negligence law clearly seeks to compensate Texas citizens injured as a result of another's negligence. Texas has a more substantial interest in securing compensation for its injured citizens than Arizona has in protecting the rights of a South Dakota corporation.

### C.    Choice of Law Conclusion.

The Court concludes that Texas has the most significant relationship to the fraud, misrepresentation, and negligence claims in this case. The Court will apply Texas law in the remainder of this order and in the jury instructions.

### III.    Lost Profits Damages.

The parties disagree on whether Texas law permits Plaintiffs to recover lost profits damages in this case. Each side cites a number of Texas decisions to support its position. Those decisions sometimes refer to "lost profits" damages and other times to "benefit of the bargain" damages. Having read all of the cases cited by the parties and several more, the Court concludes that although Texas law permits a plaintiff to recover lost profits damages in some fraud cases, it does not permit recovery of the kind of lost profits damages Plaintiffs seek with respect to the Park Plaza Tower transaction. The Court will first discuss Plaintiffs' damages theories, and then will address Texas law.[3]

### A.    Plaintiff's Damages Theories.

There are three contracts at issue in this case. Understanding all three is important to the Court's decision.

---

[3] Plaintiffs do not argue that they are entitled to recover lost profits damages for their negligence claim, and "Texas does not recognize benefit-of-the-bargain damages for negligent misrepresentation." *LHC Nashua Partnership, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 462 (5th Cir. 2011). As a result, the discussion in this section applies only to Plaintiffs' claim for fraud.

- 6 -

First, Plaintiffs entered into an Irrevocable Commitment with the Kelly Defendants. Doc. 197-2. The commitment provided that the Kelly Defendants would pay Plaintiffs $280,000 in return for Plaintiffs' deposit of $80,000. *Id.* Wells Fargo signed the commitment, but Plaintiffs have dropped any claim that Wells Fargo is liable for breach of the commitment. Doc. 101, ¶ 29.

Second, Plaintiffs agreed on a "Term Sheet" with Consolidated S Group, LLC ("CSG"), an affiliate of the Kelly Defendants. Doc. 113-5. The Term Sheet provided that Plaintiff Gazian would place $250,000 in escrow with the Kelly Defendants (the $250,000 was to come from the $280,000 Plaintiffs would receive under the Irrevocable Commitment) and that CSG would provide Plaintiffs with a $5 million loan to purchase the Park Plaza Tower. *Id.* Plaintiffs allege that the Term Sheet was discussed and agreed upon during a meeting in Dallas between Plaintiff Gazian and Vern Slocum, an affiliate of the Kelly Defendants. Doc. 101, ¶ 16. The Term Sheet was not signed, and provided that a more complete agreement would be completed within 30 days of Plaintiffs' deposit. Doc. 113-5. Plaintiffs allege that the Term Sheet was "a sham transaction." Doc. 101, ¶ 16. Plaintiffs do not allege that Wells Fargo participated in the Dallas meeting or was a party to the Term Sheet. *Id.*, ¶ 16-17.

Third, Plaintiffs entered into a Real Estate Purchase and Sales Agreement ("REPSA") with an entity known as 13111 Central Expressway, LP, for purchase of the Park Plaza Tower. Doc. 163-1 at 5.[4] Plaintiffs agreed to pay $2,740,000 for the property and to make an earnest money deposit of $30,000. *Id.* Plaintiffs assert that funds for the purchase were to come from the $5 million to be loaned by CSG under the Term Sheet. The REPSA is only one page long and does not contain signatures of Plaintiffs or 13111 Central Expressway, LP, although it does appear to contain some initials. *Id.* Plaintiffs characterize this contract as "between Plaintiffs and [a] non-party." Doc. 163 at 2. They do not allege that Wells Fargo was a party.

---

[4] A declaration of Plaintiff Gazian states that a one-page document, found at Doc. 163-1 at 5, is a "true and correct copy" of the REPSA. Doc. 163-1 at 2.

- 7 -

Plaintiffs have articulated two theories for their lost profits from the Park Plaza Tower transaction. First, they argue that they are entitled to recover from Wells Fargo the profits they would have earned if Wells Fargo's representations concerning the Kelly Defendants were true and the Kelly Defendants had in fact fulfilled their promise under the Irrevocable Commitment. Alternatively, Plaintiffs argue that they could have secured other financing to purchase the Park Plaza Tower if Wells Fargo's misrepresentations had not induced them to enter into the Irrevocable Commitment with the Kelly Defendants. Under both theories, the lost profits Plaintiffs seek to recover are those they would have earned from the purchase, improvement, and rental or sale of the Park Plaza Tower.

### B. Texas Law on Lost Profits.

Of all the cases cited by the parties, the Court finds the most instructive to be *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998); *ISG State Operations, Inc. v. National Heritage Ins. Co.*, 234 S.W.3d 711 (Tex. Ct. App. 2007); and *LHC Nashua Partnership, Ltd. v. PDMED Sagamore Nashua, L.L.C.,* 659 F.3d 450 (5th Cir. 2011).

*Formosa Plastics* was a fraud case brought by a general contractor who entered into a construction contract with a property owner. The property owner made several misrepresentations to induce the contractor to make a low bid. When the actual facts were revealed, the contractor could not perform the contract for the bid price without suffering substantial losses. The contractor sued for fraud and sought to recover the profits it would have earned on the job had the owner's representations been true. The Texas Supreme Court held that "[u]nder the benefit-of-the-bargain measure, lost profits on the bargain may be recovered if such damages are proved with reasonable certainty." 960 S.W.2d at 50. The Supreme Court explained that "while a benefit-of-the-bargain measure can include lost profits, it only compensates for the profits that would have been made if the bargain had been performed as promised." *Id*. The Supreme Court held that the contractor could recover profits he would have earned had the owner's representations been true (the profits that would have been earned on his bid price if the

1  owner had performed as promised), but the Supreme Court did not allow the contractor to
2  speculate as to what higher bid he would have made had he known the actual facts or to
3  recover the higher profits he would have earned on that higher bid.  The court explained:

> [the contractor's] testimony as to what he would have bid had he known the truth simply does not establish the benefit of any bargain he made with [the owner].  It is not based on the expenses incurred and profits lost on this contract because of [the owner's] representations, but rather is based on an entirely hypothetical, speculative bargain that was never struck and would not have been consummated.

9  *Id*.  In other words, the lost profits the contractor could recover on his fraud claim were
10 those that would have resulted from the contract with the owner as negotiated between
11 the parties.  The contractor could not look to some other contract to calculate lost profits.
12         The meaning of *Formosa Plastics* was explained by the Texas Court of Appeals in
13 *ISG*.  ISG sued for fraud, arguing that the defendant promised it an additional and much
14 larger contract, which was never delivered.  ISG argued that it should be permitted to
15 recover not only the lost profits from its initial contract with the defendant, but also the
16 lost profits from the additional contract.  The Court of Appeals disagreed: "ISG has not
17 cited, and in our research we have been unable to locate, a case allowing lost profits for
18 an unexecuted contract based on a fraudulent inducement claim.  When lost profits were
19 awarded, they were attributable to the fraudulently induced contract."  234 S.W.3d at
20 718.  After discussing *Formosa Plastics*, the Court of Appeals provided this relevant
21 statement of Texas law: "The supreme court's analysis makes clear that the basis of any
22 fraudulent inducement claim must be an executed contract that was procured by fraud,
23 without which [the contract] would not have been executed, and the damages sought must
24 flow directly from *that* contract."  *Id.* (emphasis in original).
25         These holdings were recognized as the law of Texas in *LHC*.  The plaintiff in *LHC*
26 entered into an agreement to buy a shopping-center property from the defendant.  A key
27 component of the transaction was a lease of the shopping center to be signed by Lowe's.
28 The defendant had negotiated the lease and assured the plaintiff that Lowe's would

1 execute the lease and rent the property from the plaintiff after the plaintiff purchased the
2 property. Lowe's instead elected to buy the shopping-center property itself, which it had
3 a right to do under an agreement with the defendant, resulting in the plaintiff's purchase
4 of the property and rental to Lowe's falling through. The plaintiff sued the defendant for
5 fraudulently misleading the plaintiff into believing that Lowe's would rent the property.
6 The plaintiff sought to recover the profits it would have earned had Lowe's entered into a
7 long-term lease of the property with plaintiff as the new owner. At trial, the jury awarded
8 the plaintiff more than $25 million in lost profit damages. 659 F.3d at 453-56.

9 Applying Texas and New Hampshire law, which it found to be the same, the Fifth
10 Circuit reversed the award of lost profit damages. *LHC* relied on both *Formosa Plastics*
11 and *ISG* in holding that a plaintiff could not recover lost profits under Texas law that "did
12 not flow directly" from the contract entered into with the fraudulent defendant. *Id*. at
13 465. *LHC* quoted at length from § 549 of the Restatement (Second) of Torts, which had
14 been cited by the Texas Supreme Court in *Formosa Plastics*. Relying on § 549 and its
15 comments, the Fifth Circuit observed that normally "the purpose of a tort action is to
16 compensate for loss sustained and to restore the plaintiff to his position, and *not* to give
17 him the benefit of any contract he has made with the defendant." *Id*. at 465 (emphasis
18 added). Section 549 recognizes an exception to this rule when traditional tort damages
19 are insufficient, and provides several examples of when lost profits damages can be
20 recovered. In each example, "the fraudulent transaction was completed, leaving the
21 plaintiff with a bargained-for-item of less value than the defendant had represented." *Id*.
22 Relying on *Formosa Plastics* and *ISG*, the Fifth Circuit declined to extend lost profits
23 damages beyond this narrow set of circumstances.

24 As a result, *LHC* held that the plaintiff could not recover from the defendant the
25 profits it would have earned from owning the shopping-center property and leasing it to
26 Lowe's. The Fifth Circuit found that such lost profits "did not flow directly" from the
27 plaintiff's agreement with the defendant. *Id.* at 464. Rather, they would have flowed
28 directly from a lease with Lowe's – a lease that was never consummated because the

entire deal fell through. *See id.* at 465 ("LHC cannot recover lost profits flowing from such an anticipated agreement under Texas law."). The plaintiff was entitled to recover the out-of-pocket losses it suffered as a result of the defendant's fraud. *Id.*[5]

### C. Analysis.

From these cases, the Court concludes that Plaintiffs cannot recover – under either of their theories – the profits they would have earned had they completed the REPSA and acquired the Park Plaza Tower. Of all the contracts at issue in this case, only the Irrevocable Commitment could even arguably have included Wells Fargo as a party, and Plaintiffs have disavowed any breach of contract claim against Wells Fargo based on this agreement. Doc. 101, ¶ 29. Wells Fargo is not alleged to have signed or been a party to the Term Sheet, nor was Wells Fargo a party to the REPSA. Doc. 163-1 at 5. Indeed, Plaintiffs themselves acknowledge that the REPSA was entered into with a "non-party." Doc. 163 at 2.

The REPSA in this case is akin to the lease agreement with Lowe's under which the plaintiffs sought to recover lost profits in *LHC*. Both are separate contracts with a separate entity for a real estate agreement that allegedly would have produced substantial profits. Both allegedly were thwarted by the defendant's failure to perform a different

---

[5] Although the other cases reviewed by the Court are not always clear, the Court finds them to be generally consistent with the Texas law described in *Formosa Plastics*, *ISG*, and *LHC*. They generally concern profits that would have been earned in the transaction with the tortfeasor. *See Aquaplex, Inc. v. Rancho LaValencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009) (counter-plaintiff entitled to recover profits that would have been earned on sale of the joint venture property if the other joint venturer had not fraudulently blocked the sale); *Ludlow v. DeBerry*, 959 S.W.2d 265, 276 (Tex. Ct. App. 1997) ("Ludlow sought 'benefit of the bargain' damages in that he sought additional income he would have received if DeBerry had complied with the alleged oral contract."); *Matthews v. AmWest Sav. Ass'n*, 825 S.W.2d 552, 554 (Tex. Ct. App. 1992) (plaintiff entitled to recover the profits he would have earned had defendant kept his promise and sold the plaintiff the property in question at the price agreed upon); *Trenhome v. Ratcliffe*, 646 S.W.2d 2d 927, 933 (Tex. 1983) (plaintiff entitled to recover profits he would have received had defendant removed trailer park as promised). The Court finds other cases cited by the parties to be inapposite. *Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mtk. & Trade*, 305 S.W.3d 309, 314 (Tex. Ct. App. 2009), is a contract case, not a fraud case, and *Lamb v. Phuong Nguyen*, 335 S.W.3d 786, 792 (Tex. Ct. App. 2011), turned on the policy of the statute of frauds which is not at issue here. *See also Case Corp. v. High Class Bus. Sis. Of Am., Inc.,* 184 S.W.3d 760, 770 (Tex. Ct. App. 2005) (same).

- 11 -

agreement as promised. And yet the Fifth Circuit squarely held that the plaintiff in *LHC* could not recover profits lost from the Lowe's lease under Texas law. *LHC*, 659 F.3d at 464-65. That holding precludes a recovery of lost profits under the REPSA here.

The Fifth Circuit explained that § 549 of the Restatement, which is followed in Texas courts, normally does not permit plaintiffs to recover lost profits in tort cases. *Id.* at 464. The exception to this rule, found in § 549(2), provides that in a narrow class of cases "[t]he recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract *with the maker*." *Id.* at 462 (quoting Restatement (Second) of Torts, § 549(2)) (emphasis added). As a comment to § 549(2) explains, this section applies "[w]hen the plaintiff has made a bargain *with the defendant*[.]" Restatement § 549, comment g (emphasis added). Plaintiffs did not make a bargain with Wells Fargo in the REPSA; they made that bargain with a third person, 13111 Central Expressway, LP. Thus, even if Plaintiffs could show that they were induced to enter into the REPSA by Wells Fargo's fraud, they cannot recover profits they would have earned as a result of the REPSA. As the Restatement explains, out-of-pocket losses permitted by § 549(1), not lost profits permitted by § 549(2), apply when a plaintiff "has suffered his pecuniary loss through reliance upon the misrepresentation in dealing with a third person[.]" *Id.*

As the Texas Court of Appeals explained in *ISG*, "the basis of any fraudulent inducement claim must be an executed contract that is procured by fraud, without which [the contract] would not have been executed, and the damages sought must flow directly from *that* contract." 324 F.3d at 718 (emphasis in original). The profits Plaintiffs seek to recover for the failure of the Park Plaza Tower acquisition do not flow directly from the only contract Wells Fargo could be said to have entered with Plaintiffs – the Irrevocable Commitment. The only profits promised in that agreement were $200,000 to be paid to Plaintiffs in addition to the return of their $80,000 investment. Doc. 197-2.

The Court concludes that Texas law does not permit Plaintiffs to recover from Wells Fargo the profits they would have earned in a contract with an entirely different

entity. The holding in *LHC* clearly precludes such a recovery.[6]

**IV.     The Court Will Enter Summary Judgment on Park Plaza Tower Lost Profits.**

The Court's Case Management Order set a deadline for filing summary judgment motions and stated that only one motion could be filed per side. Doc. 50 at 4. For this reason, the Court initially denied Wells Fargo's motion in limine regarding lost profits. Doc. 184. At the final pretrial conference and in subsequent briefing, however, several facts became clear. Doc. 196. The parties had not briefed the choice-of-law issue. Plaintiffs had not clearly disclosed the nature of their lost-profit claim. And the viability of that claim needed to be decided before trial. Consuming days of trial on a damages claim not available under the relevant state's law would waste everyone's time and resources.[7]

The Court and the parties engaged in an extensive discussion of this issue at the final pretrial conference (Doc. 196), and the parties were each allowed an additional 25

---

[6] The Court also has serious questions about whether the Term Sheet and REPSA are valid contracts. As already noted, the Term Sheet is not signed and specifically states that an agreement will be drafted within 30 days. Doc. 113-5. The REPSA, which purports to be a contract for a multi-million-dollar real estate transaction, is also one page in length and includes only four numbered paragraphs. Doc. 163-1 at 5. It includes what appear to be initials, but no formal signatures and no indication of who made the initials. The Court also finds it striking that CSG would be willing to loan $5 million with no express security and for a real estate purchase of less than $3 million, essentially granting Gazian an unsecured $2 million to be used as he pleased. This is all the more striking when the evidence in this case suggests that Gazian did not have the $80,000 needed for the Irrevocable Commitment. The Court need not address these issues, however, because Texas law does not allow the claim for lost profits from Park Plaza Tower even if the Term Sheet and REPSA were contracts.

[7] After reviewing the parties' supplemental briefing, the Court is persuaded that Wells Fargo was not on notice of Plaintiffs' claim that Plaintiffs were precluded from finding alternative financing for the Park Plaza Tower acquisition as a result of Wells Fargo's fraud. The written discovery served by Wells Fargo was not as thorough as it could have been, but some of its inquiries produced answers that appear quite inconsistent with this causation theory. *See* Doc. 199-6 ("Plaintiffs attempted to find investors but were unable to until the transaction with the Kelly Defendants."); Doc. 199-7 (when asked to identify all loan and credit applications Plaintiffs submitted to any person during the time period of the Park Plaza Transaction, they responded "none."). The Court does not conclude that Plaintiffs acted in bad faith, but it does appear that the loss-of-alternative-financing theory of causation was not disclosed until the motion in limine phase of this case. As a result, it could not have been addressed in the motions for summary judgment. Plaintiffs rather deftly try to argue that it was Wells Fargo that failed to disclose an affirmative defense, but one cannot assert an affirmative defense to an undisclosed claim.

- 13 -

pages of briefing (Docs. 197, 199, 203, 204). The Court advised the parties that it would rule on these issues on the briefs unless it found oral argument necessary, which it does not. Doc. 196 at 45.

Given the full opportunity the parties have had to address these issues, the Court concludes that summary judgment should be entered in favor of Wells Fargo on Plaintiffs' claim for lost profits from the Park Plaza Tower transaction. For reasons explained above, such damages cannot be recovered under Texas law.

V.     **Other Motions.**

A.     **Wells Fargo's Fifth Motion in Limine.**

The Court permitted additional briefing on Wells Fargo's motion in limine to exclude Gazian from testifying about various aspects of lost profits. Doc. 189. The Court directed the parties to address four issues: (1) whether Gazian personally has ever participated in a four-day jewelry market like those upon which he bases his revenue estimate, and, if so, the nature of his participation; (2) the precise factual basis for his $100,000 per-market; (3) whether Gazian has ever been in the billboard business; and (4) the full extent of Gazian's commercial construction experience. *Id.* The parties have completed the additional briefing. Docs. 198, 202.

Issues (3) and (4) concern profits lost from the failure of the Park Plaza Tower. These issues are moot in light of the Court's grant of summary judgment in this order.

Issues (1) and (2) concern the basis for Gazian's estimate that he could have made $100,000 during a four-day jewelry show from the sale of four diamond rings if he had use of the funds he transferred to Wells Fargo. The Court's inquiry sought to determine the precise foundation for this estimate.

In response, Plaintiffs assert that Gazian has been in the jewelry business for 34 years, including retail sales and the custom order business. Doc. 198 at 3. Plaintiffs state that Gazian moved his storefront to the Dallas World Trade Center in 2012, and that the center conducts trade shows for tenants four times per year. *Id.* Plaintiffs describe the trade show as a "kind of 'open house' where visitors are invited . . . and visit all of the

1    shops[.]" *Id.* But Gazian makes this concession in his declaration: "since I have no
2    inventory, I am unable to attract and retain customers in the same manner as other
3    jewelers located at the World Trade Center are able to." Doc. 198-2. Thus, it appears
4    that Gazian has not personally participated in the trade shows on which his estimate is
5    based. Indeed, Plaintiffs largely fail to respond to the Court's direct request for evidence
6    that Gazian "personally has ever participated in a four-day jewelry market like those
7    upon which he bases his revenue estimate." Doc. 198.

8    Under Texas law, lost profits must be "proved with reasonable certainty."
9    *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 776 (Tex. 2009) (citation
10   omitted). They cannot be based on hypothetical or speculative transactions. *Id.* Indeed,
11   "[w]hen a review of the surrounding circumstances establishes that the profits are not
12   reasonably certain, there is no evidence to support the lost profits award." *Id*. (citation
13   omitted).

14   Although Gazian has experience in the retail and custom jewelry businesses, he
15   has no personal experience in the trade shows upon which his lost profits estimate is
16   based. The Court concludes that his testimony about the profits to be made in such trade
17   shows would be hypothetical, speculative, and impermissible under Texas law. The
18   Court therefore will grant Wells Fargo's fifth motion in limine. Doc. 145.

19   **B.    Plaintiffs' Motion to Strike.**

20   Plaintiffs have moved to strike Wells Fargo's designation of non-parties at fault
21   based on Texas law. Doc. 133. Wells Fargo responds that such a motion is improper
22   under Arizona law. Doc. 172. Now that the Court has concluded that Texas law governs
23   the claims in this case, the Court will require the parties to complete the briefing on this
24   issue. Wells Fargo should file a response, based on Texas law, by **February 27, 2015**.
25   Plaintiffs should file a reply by **March 13, 2015**. Eight pages each.

26   **VI.   Second Final Pretrial Conference.**

27   The Court will hold a second final pretrial conference on **March 20, 2015, at 3:00**
28   **p.m.** Counsel may participate by phone. The parties should be prepared to select a date

for trial, and thus should be fully informed on the availability of witnesses and parties.

At least ten days before the final pretrial conference, the parties shall submit to the Court (a) a revised proposed final pretrial order (Doc. 144) that takes into account the rulings in this order and on the motions in limine, (b) proposed jury instructions based on Texas law, and (c) revised exhibit and witness lists and a proposed verdict form.[8]

**IT IS ORDERED:**

1. Summary judgment is **granted** on Plaintiffs' claim for lost profits from the Park Plaza Tower transaction.
2. Wells Fargo's motions to strike (Docs. 202, 204) are **denied** as moot.
3. Wells Fargo's fifth motion in limine (Doc. 145) is **granted**.
4. A Final Pretrial Conference shall be held on **March 20, 2015 at 3:00 p.m.** The parties shall prepare for the second final pretrial conference as described above.

Dated this 12th day of February, 2015.

David G. Campbell
United States District Judge

---

[8] The revised proposed final pretrial order is not an opportunity to revive claims that were abandoned in the previous proposed final pretrial order (Doc. 144), nor is it an opportunity to identify witnesses or exhibits that were not identified in that proposed order. The revisions should be used to narrow the case in accordance with the rulings made in this order and on the motions in limine.